**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**
**SOUTHERN DIVISION AT CHATTANOOGA**

| | | |
|---|---|---|
| **MELODY BABB,** | ) | |
| **DEANNA FULTS, and** | ) | **Case No.:** |
| **MARK RICHERSON** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **JURY DEMAND** |
| **v.** | ) | |
| | ) | |
| **TENNESSEE VALLEY AUTHORITY** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## COMPLAINT

Plaintiffs Melody Babb, Deanna Fults and Mark Richerson, through counsel, file this

Retaliation Complaint against Defendant Tennessee Valley Authority (TVA).

### I. JURISDICTION AND VENUE

1.      This lawsuit is filed pursuant to the Energy Reorganization Act of 1974, as

amended, 42 U.S.C. § 5851 (the ERA), and specifically pursuant to Section 211(b)(4), which

provides for removal to federal district court.

2.      More than one year has elapsed since the Plaintiffs filed a complaint with the

Secretary of Labor and no final decision has been made by the Secretary; therefore, this action is

commenced in the appropriate district court.

3.      Jurisdiction is conferred by the ERA.

4.      Venue lies in this District because the Defendant TVA's headquarters is located

within this judicial district; two of three Plaintiffs reside and work within this judicial district,

and the third consents to venue in this District.

1

## II. NATURE OF PROCEEDING

5.      This is a suit by three current employees against their employer, TVA, for retaliation against them for engaging in activities protected by the ERA.  Plaintiffs seek reinstatement to their former positions as Senior Program Managers in TVA's Nuclear Employee Concerns Program (ECP); equitable and compensatory damages as a result of harm to their professional reputations, professional degradation and defamation, public embarrassment, shame and humiliation associated with their removal; as well as equitable and compensatory damages for the emotional distress, mental and emotional anxiety, loss of familial relationships, and a variety of physical and emotional injuries suffered as a result of TVA's wrongful conduct. Plaintiffs also seek the attorney fees and costs incurred in prosecuting this case; and such other equitable and compensatory damages as allowed by, and as may be necessary to effectuate, the purposes of the ERA.

## III. PARTIES

6.      Plaintiff Melody Babb has been employed by TVA since May 1995.  She is a resident of Hamilton County, Tennessee; and is an "employee" as defined by the ERA.  Plaintiff Babb was the ECP Senior Program Manager at the Sequoyah Nuclear Plant in Soddy Daisy, Tennessee until her removal from that position on July 8, 2019.

7.      Plaintiff Deanna Fults has been employed by TVA since November 2004.  She is a resident of Hamilton County, Tennessee; and is an "employee" as defined by the ERA. Plaintiff Fults was the ECP Senior Program Manager at the TVA Corporate office in Chattanooga, Tennessee until her removal from that position on July 8, 2019.

2

8.      Plaintiff Mark Richerson has been employed by TVA since July 2004.  He is a resident of Madison County, Alabama; and is an "employee" as defined by the ERA.  Plaintiff Richerson was the ECP Senior Program Manager at the Browns Ferry Nuclear Plant in Athens, Alabama until his removal from that position on July 8, 2019.

9.      Defendant Tennessee Valley Authority is an executive branch corporate agency of the United States created pursuant to the TVA Act of 1933, 16 U.S.C. § 831, et. seq.  TVA produces, distributes, and sells electric power; is doing business in Hamilton County, Tennessee; and is an "employer" as defined by the ERA.

## IV.  FACTUAL BACKGROUND AND BASES OF PLAINTIFFS' CLAIMS

**Regulatory Framework**

10.     Defendant TVA operates several nuclear power plants -- the Sequoyah Nuclear Power Plant (SQN) in Soddy Daisy, Tennessee, the Watts Bar Nuclear Power Plant (WBN) in Spring City, Tennessee, and the Browns Ferry Nuclear Power Plant (BFN) in Athens, Alabama. All of these nuclear power plants are licensed by the Nuclear Regulatory Commission (NRC) under the federal Atomic Energy Act of 1954, as amended, 42 U.S.C. § 2011, et seq. (the AEA).

11.     The License for each plant sets forth the terms and conditions for the operation and maintenance of the plant.  Licenses can be revoked and/or modified by the NRC in response to findings of non-compliance with the license, and issued through Enforcement Actions and, in some cases, through Confirmatory Orders.

12.     One of the NRC's regulations is 10 C.F.R. § 50.7, which prohibits discrimination by a licensee against any employee or contractor for engaging in certain protected activities. Discrimination includes discharge and other actions that relate to compensation, terms,

3

conditions, or privileges of employment. The protected activities include those that "are related to the administration or enforcement of a requirement imposed under the Atomic Energy Act or the Energy Reorganization Act." 10 C.F.R. § 50.7(a).

**Safety Conscious Work Environment**

13.     The NRC also sets expectations that each licensee maintain a Safety Conscious Work Environment (SCWE) in which employees feel free to raise license compliance or safety concerns (NRC SCWE Policy Statement: *"Freedom of Employees in the Nuclear Industry to Raise Safety Concerns Without Fear of Retaliation*," (51 FR 24336, May 14, 1996)); and monitors the safety culture at licensed facilities through routine inspections or in response to events that demonstrate weaknesses in safety culture. (NRC Inspection Manual, Chapter 95003, *Supplemental Inspection for Repetitive Degraded Cornerstones, Multiple Degraded Cornerstones, Multiple Yellow Inputs or One Red Input* (1/1/2016); NRC Inspection Manual, Inspection Procedure 95003 Attachment 2, *Guidance for Conducting an Independent NRC Safety Culture Assessment* (4/1/2019); and NRC Inspection Manual, Chapter 310, *Aspects Within the Cross-Cutting Areas* (2/25/2019).

**Relevant NRC Regulatory Enforcement Actions**

14.     With relevance to this case, TVA has been the subject of regulatory action taken by the NRC over the past 10+ years for engaging in discrimination and retaliation against employees who have raised concerns, as well as for the existence of chilled work environments in which employees have indicated a reluctance to raise concerns out of fear of reprisal. These actions have, in some cases, resulted in NRC Enforcement Actions which led to modifications of the terms and conditions of the TVA Licenses.

4

15.     Through the application of the NRC's Enforcement Policy, when the NRC finds, and confirms, that a situation exists at a licensed facility where employees were retaliated against, and/or indicates employees are reluctant to raise safety concerns for fear of potential reprisal for any reason, it can issue a "chilling effect" or "chilled work environment" letter to the licensee. These letters, specific to the circumstances, generally require actions by the licensee to improve the work environment, demonstrate the willingness of employees to raise concerns, or take other actions to mitigate the impacts of a negative event. These letters cannot be "lifted" until improvements have been confirmed through follow up NRC inspections. (NRC Allegation Manual, Section 5.2.i.6, *"Chilling Effect Letters"* (12/22/2016)).

2009 TVA License Modification

16.     That is exactly what happened at TVA in 2009, when the NRC's Office of Investigation (OI) confirmed two instances of employment retaliation in violation of 10 C.F.R. § 50.7. The NRC and TVA then entered into a Confirmatory Order. *In the Matter of TVA Browns Ferry Nuclear Plant, Sequoyah Nuclear Plant, and Watts Bar Nuclear Plant,* Confirmatory Order Modifying License (Effective Immediately), EA-09-009; EA-09-203 (December 22, 2009).

17.     As part of that Order, TVA agreed to make significant changes in the monitoring of its nuclear plant work environments. This included, among other things, having the ECP[1] conduct "periodic pulsings of individual TVA and contractor employees (approximately 50 individuals per quarter per site) in which feedback is sought regarding work environment issues

---

[1]  At that time the program was referred to as the Concerns Resolution Program (CRP), which was subsequently changed to the Employee Concerns Program (ECP).

5

including willingness to raise concerns." It also included other changes and requirements that were projected into 2013. *Id.*, at 3.

<u>The TVA Employee Concerns Program</u>

18.     The TVA ECP Program is "charged with providing an independent avenue for employees to raise concerns." "It was established to help ensure the SCWE by providing an alternate reporting avenue, independent of the line organization, so that all employees supporting nuclear (including contractors) are free to express safety issues, concerns, or differing views to nuclear management without fear of reprisal. ECP is also responsible for ensuring that management is informed of trends that could impact the SCWE." (TVA Office of Inspector General Evaluation Report 2016-15398, at pp. 1-2 (9/15/2016)).

19.     In 2018-2019 the TVA ECP consisted of a Senior Department Manager, Inza Hagins-Dyer, and four ECP Senior Program Managers, Melody Babb (SQN), Deanna Fults (Corporate), Mark Richerson (BFN), and Ruth Fordham (WBN). The ECP was part of the TVA Nuclear Oversight (NOS) department, headed by the Vice-President of Nuclear Oversight, Greg Boerschig.

<u>2016-2017 "Chilling Effect" Letter from the NRC (WBN Operations Department)</u>

20.     Relevant to this case, and part of the facts contributing to the adverse actions taken against the Plaintiffs, are the 2016-2017 regulatory actions taken by the NRC against TVA as a result of events at WBN, as explained below.

6

21.     In January 2016 the TVA Office of Inspector General[2] (TVA OIG) received a Hotline Complaint alleging a chilled/hostile work environment existed in the Operations department at WBN, as a result of an incident that occurred within the control room in 2015. The TVA OIG investigated, confirmed the existence of a chilling effect, and referred the issue to the NRC.

### 2017 NRC Confirmatory Order EA-17-022

22.     The NRC also investigated and confirmed that a chilling effect existed in the Operations department at WBN; and, on March 23, 2016, the NRC issued a Chilled Work Environment Letter (CWEL) to TVA, requiring that it address the situation.  (NRC Letter to Joseph Grimes, TVA Chief Nuclear Officer, re: *Chilled Work Environment for Raising and Addressing Safety Concerns at the Watts Bar Nuclear Plant*, EA-16-061).

23.     TVA responded to the NRC's letter by committing to take certain corrective actions, including conducting pulse surveys of 10% of the WBN Operations department every month, and conducting and trending monthly pulse surveys in selected other departments for a period of 12 months.  That was subsequently extended as the SCWE at the sites got worse.

24.     On December 1, 2016 the NRC completed an inspection at WBN, and identified an apparent violation of the 2009 Confirmatory Order and license modification regarding the inadequacy of TVA's corrective actions to ensure that personnel adverse actions do not cause a "chilling effect if the employment action, despite its legitimacy, could be perceived as retaliatory

---

[2]  Pursuant to the Inspector General Act of 1978, as amended, TVA is required to have an Inspector General, and to report to Congress semiannually regarding evaluations that remain unresolved after 6 months from the date of issuance of a relevant report.

by the workforce."  (*In the Matter of TVA, Watts Bar Nuclear Plant, Browns Ferry Nuclear Plant, and Sequoyah Nuclear Plant,* Confirmatory Order (Effective Upon Issuance), EA-17-022, July 27, 2017).

25.     After some negotiations, on July 27, 2017, the NRC issued Confirmatory Order EA-17-022 to TVA for its failure, at WBN, between November 2014 and August 2016, to ensure that adverse employment actions at the plant complied with employee protection regulations and that the actions did not negatively impact the SCWE.  The NRC determined that TVA's failure was a violation of a previous Confirmatory Order issued in 2009 (EA-09-009, EA-09-203).

<u>2016 and 2018 OIG Findings Regarding the ECP Work Environment</u>

26.     In 2016, after the confirmed findings by the NRC and the TVA OIG of a "chilled work environment" in the WBN Operations department, the TVA OIG initiated evaluations of several other TVA nuclear work environments, including the Nuclear Oversight group, which included both the Quality Assurance (QA) and the ECP departments.

27.      On September 15, 2016, the TVA OIG issued Evaluation Report 2016-15398, *Work Environment for Nuclear Oversight*, which found that "most [3 of 4] ECP employees did not feel free to raise concerns or problems without fear of retaliation."  There were only four ECP employees, including all three plaintiffs, who were interviewed by the TVA OIG in connection with this evaluation.

28.     The 2016 Report also identified issues within the ECP department that could impact employees' willingness to raise concerns, including (1) distrust of management [1 of 4]; (2) past concerns being overridden or ignored [2 of 4]; and (3) work being influenced [2 of 4]. The TVA OIG recommended that TVA take "appropriate actions to improve the environment for

8

raising concerns," and to "identify opportunities to build trust between management and employees." *Id.*, at ii.

29.    TVA agreed to take corrective actions and provided a list of commitments, which the TVA OIG accepted.

30.    Two years later, the TVA OIG initiated a follow up to the 2016 evaluation of the work environment within the Nuclear Oversight department, including the ECP. Again, all four ECP employees, including the Plaintiffs, were interviewed by the TVA OIG. Again, three out of the four ECP employees stated that they did not feel free to raise all concerns without fear of retaliation. Their cooperation with the OIG investigation was legally protected activity.

31.    On August 27, 2018 the TVA OIG issued a draft to TVA and, on September 24, 2018, issued the final Evaluation Report 2018-15541 – *Nuclear Oversight Work Environment Follow-Up,* finding that 3 of 4 ECP employees still feared retaliation for raising concerns.

32.    Further, as compared to 2016, the lack of trust in management did not change [1 of 4], but the concerns about ECP work being overridden or ignored worsened, to 3 of 4 indicating that belief; and 2 of 4 ECP employees felt that their work had been influenced. *Id.*, at 7-8.

The 2018 NRC Chilling Effect Letter (WBN Radiation Protection Department)

33.    In June 2018 the NRC completed a follow up inspection at WBN of the NRC's 2017 Confirmatory Order, the 2016 Chilling Effect Letter (WBN Operations Department), and the March 14, 2018 Follow Up Inspection. Neither the March 2018 nor the June 2018 NRC inspections resulted in the NRC lifting the CWEL.

34.     Instead, in the August 2018 Follow-Up Inspection Report the NRC identified that it had found a chilled work environment within the WBN Radiation Protection/Chemistry (RadPro) department, finding that the RadPro personnel "were impacted, multiple reporting avenues were affected, and the types of concerns personnel were hesitant to raise included regulatory and radiological safety concerns."  (8/17/2018 NRC Letter to Joseph Shea, Re: *Watts Bar – Follow-up for NRC Confirmatory Order (EA-17-022) and Chilled Work Environment Letter (EA-16-061) and NRC Inspection Report*).

35.     Relevant to the facts of this case, in response to the NRC's August 2018 follow-up inspection, TVA initiated its own Root Cause Analysis (RCA) of the SCWE issues within the RadPro department to understand why the SCWE issues and chilling effect had not been self-identified in a timely manner or appropriately addressed.  The RCA was chaired by Lee Sanders, WBN Plant Support Director.  (RCA Rev. 0 was issued on November 15, 2018).

36.     In addition, TVA contracted with Oak Ridge Associated Universities (ORAU) to perform a general analysis of the RadPro work environment and, as a result of the findings issued in August 2018, TVA then retained an outside law firm, Steptoe & Johnson, LLP, to investigate the RadPro work environment, and individual actions.

37.     In December 2018 TVA established an internal team to evaluate all the findings regarding the RadPro department issues.  The Team was to recommend any gaps in the work and/or findings from the numerous reports, consider individual personnel actions for all individuals named in the Steptoe report, and make recommendations on various findings and issues. (The Team Report was issued January 16, 2019)  None of the recommendations or findings identified the Plaintiffs as having any responsibility for the RadPro issues.

10

**The Conditions and Drivers to Remove the Plaintiffs from Their ECP Positions**

38.     The final September 2018 TVA OIG Report required corrective action regarding its findings that the ECP employees themselves feared retaliation for raising concerns, and believed that their work was being overridden, ignored, or influenced by management.

39.     As a result of his receipt of the draft report, Boerschig began a process to decide what actions to take.  On August 31, 2018 he created a working draft PowerPoint in which he identified the "Conditions and Drivers" as the findings in the TVA OIG report itself.  His initial PowerPoint made no reference to any other reasons as a motivation.

40.     Boerschig then also reviewed other documents, including ORAU site survey results from 2016, consultant reports, ECP self-assessments, input from site managers, and other materials from the previous years.  None of these documents recommended removing the Plaintiffs from their respective positions.  However, these documents included Plaintiffs' own protected activities, and concerns about the department being pressured by management, having their findings ignored, and being mistreated by site managers when they identified problems, and their concerns about the department's internal issues.

41.     Many of the assessments Boerschig reviewed had positive comments about the ECP, including the 2017 WBN Focused Self-Assessment, which stated that "[r]ecent feedback on the independence and confidence in the ECP has been on a positive trend…. The conclusion of this assessment team is that the ECP meets all of the criteria set forth in the objective." (WBN Focused Self-Assessment WBN-LIC-FSA-18-001 Report Re: WBN CWE NRC Inspection October 30-November 17, 2017).  A Self-Assessment of the ECP, performed by an outside group of industry consultants, along with the Plaintiffs, identified positive issues and actions that

11

management needed to take for ECP to be successful. Comments from a PowerPoint prepared for the Executive and ECP Team debrief noted "A great team with the right heart and willpower" and "A team to be admired for tenacity and a desire to be excellent." (Leadership and ECP Team Debrief for CRP-OTH-FSA-18-002, TVA ECP Program Assessment (6/28/2018)).

42. Boerschig also reviewed the 2017/2018 ORAU survey data, which included responses to the question about employees' willingness "to report an issue or concern to our Ethics or Employee Concerns Program." Over ninety-one percent (91.3%) of the Corporate employees "strongly agreed" or "agreed." Over eighty-nine percent (89.4%) of the BFN employees "strongly agreed" or "agreed." And, just under ninety-percent (88.9%) of the SQN employees also said that they would do so. (2018 ORAU Nuclear Safety Culture Evaluation Reports for Corporate, BFN and SQN).

43. For the period from 2016 through 2019, the TVA ECP was rated "acceptable" or higher, and there was never any negative feedback on the ECP program from the Nuclear Safety Culture Monitoring Panel (NSCMP) meetings or the biannual Site Leadership Team (SLT) meetings. These meetings were held at all three sites and the corporate office. This equates to over 96 reviews of the ECP, from a variety of oversight teams, that all found the ECP performance favorable.

44. Boerschig either ignored or reconsidered his own views from just months earlier, identified in the March 2018 Nuclear Oversight Strategy Document for FY2018-2022: "We have had stability in the group for several years, so individuals are proficient in their area ... and are getting well known at their respective sites...."; "[o]ur employees are committed to helping people get their issues resolved. Our employees understand their roles and are deeply committed

12

to fulfilling their responsibilities"; "[w]e have employees from all different backgrounds…. We also have diversity in personality types that helps us see things from different perspectives." And finally, under Stability: "Although there is an expectation for a leadership change within a year or so, <u>the employee base is expected to be stable. This stability can be leveraged for continuous improvement initiatives</u>." (emphasis added)

45.     Boerschig did consider complaints and animosity from site managers at WBN and BFN, as well as from the Legal Department and other Senior Managers, about the ECP Senior Department Manager Inza Hagins-Dyer. These complaints included animosity towards Hagins-Dyer, who had refused to turn over to outside legal counsel, ECP files of confidential ECP informants from the RadPro department. Hagins-Dyer strongly believed that her duty was to protect the confidentiality, and identity, of those employees who had contacted the ECP with concerns. Although Boerschig agreed with her, he expressed fear that he and Hagins-Dyer could both be fired if they did not turn over the ECP files.

46.     Boerschig considered complaints about Plaintiff Fults and her continued identification of inappropriate behaviors by various TVA managers that undermined a SCWE. Specifically, he considered complaints from Corporate Nuclear Licensing Vice President Joseph Shea, regarding a highly contentious series of retaliation complaints in that department. He also considered complaints from BFN site management about Plaintiff Richerson and his continued identification of issues within the Problem Identification and Resolution (PI&R) processes, including writing Condition Reports. He also considered complaints from management about the Plaintiffs conducting "pulsings" and work environment assessments. All of these actions

13

complained of were protected activities. Upon information and belief there had been no complaints about Plaintiff Babb from the SQN Plant Manager.

<u>The Arrival of the New Chief Nuclear Officer</u>

47.     On October 15, 2018, a new Chief Nuclear Officer (CNO), Timothy Rausch, arrived at TVA from the Susquehanna nuclear plant in Pennsylvania. He was advertised to have led Susquehanna out of an NRC "CWEL" a decade earlier. However, there actually was no CWEL at Susquehanna, and the NRC had resolved the potential chilling effect issues before he assumed the role of CNO at Susquehanna in July 2009.

48.     In early November 2018, Rausch met with Boerschig and asked for a plan to resolve the regulatory challenges regarding the ECP. Upon information and belief, Rausch raised information brought to his attention from senior managers complaining about the ECP continuing to find problems at the sites that showed chilling effects within the various departments and substantiating employee concerns. Rausch suggested to Boerschig that the Susquehanna ECP model was successful, and told him he should investigate that option.

49.     Upon information and belief, at some point in December 2018 Boerschig, strongly influenced by the new CNO Rausch and complaints of other senior managers, known and unknown to the Plaintiffs, decided that the only way to eliminate the increased scrutiny by the NRC and to resolve the OIG findings, was to remove the Plaintiffs. That decision included removing the entire ECP staff, who performed NRC-required "pulsings," conducted controversial work environment assessments, protected the identity of employees or contractors who contacted the ECP, provided honest information to the NRC and OIG in connection with their work, and made a record of concerns in the Corrective Action Program.

14

<u>Decision to Remove the Plaintiffs Made before the end of December 2018</u>

50.     By no later than the end of December 2018 Boerschig had made the decision to remove all the Plaintiffs, as well as the WBN ECP Senior Program Manager Ruth Fordham and the Senior Department Manager Inza Hagins-Dyer from their ECP positions.  He communicated this decision to, at least, Rausch, Lee Sanders, OGC lawyer Chris Chandler, the HR department, and to TVA Consultant Gary Mauldin.

51.     At some point before January 2, 2019 Boerschig identified the decision to remove all the ECP personnel in a draft PowerPoint presentation.  The draft PowerPoint was prepared for use at a January 23, 2019 meeting of the Nuclear Oversight Committee (NOC) of TVA's Board of Directors.  Boerschig forwarded the first full draft to CNO Rausch on January 2, 2019.  The PowerPoint draft makes repeated references to the removal of all the ECP personnel.

52.     The PowerPoint presentation was further refined, edited, and condensed over the next few weeks, but the decision to remove all the ECP personnel was never removed or changed.  Ultimately the original January 2 draft 10-page PowerPoint, with 7 pages of Notes Summaries, was reduced to a single slide, not even prepared by Boerschig.  The ECP personnel removal decision was presented to the NOC by CNO Rausch.

<u>The Removal of the ECP Staff</u>

53.     Sometime in late 2018 or early 2019, WBN ECP Senior Program Manager Ruth Fordham received a "heads up" notice from a TVA Consultant that if she were considering leaving TVA, she should do so "sooner rather than later."  She retired from TVA, effective May 10, 2019, in advance of the notification provided to the Plaintiffs of their removal.  She quickly secured a position at a different facility as an ECP professional.

54.     Shortly before the Plaintiffs were notified of their removal from their positions, Boerschig and HR Manager Amanda Poland met with Inza Hagins-Dyer and told her of the changes being made to the ECP Program.  She was offered a severance package or the opportunity to retire.  She decided to retire, signed a separation agreement, and continued to work within the ECP in a reduced "ECP Consultant" role, until she retired several months later.

55.     On May 13, 2019 Boerschig told the Plaintiffs that they were going to be removed from their positions as ECP Senior Program Managers, and presented them with a severance package.  He told them that the decision was not based on their performance.  They were told that if they declined separation, they could apply for other open jobs within TVA, and stated that they would continue in their ECP positions until July 8, 2019.  They were not told what would happen to them if they were not able to secure employment within TVA.  Nor were they advised to do anything differently or to follow any different processes or procedures.

56.     Site-wide notices about the Plaintiffs' removal began the following day.

**No Legitimate Basis for Removal of Plaintiffs**

57.     The communications prepared to explain the basis for the removal of the entire ECP staff were not true.  The essential story promulgated by TVA was that 1) because of complaints of lack of confidence and trust in the ECP, provided by the workforce in surveys and raised by the NRC, TVA had no choice but to remove them; and 2) that "benchmarking" other high-performing programs in the industry had identified that the Plaintiffs did not have the needed "skills and abilities" to do the job.  Neither of these statements were true.

16

<u>"Benchmarking" Did Not Provide the Basis for the Reason to Remove the Plaintiff</u>

58.     Benchmarking is a formal TVA process.  The procedure "provides the overall structure for the planning, preparation, performance, reporting, oversight, and condition reporting associated with the conduct of … [benchmarking] activities….  All benchmarking activities are required to comply with the requirements of this procedure."  NPG-SPP-22.102, *NPG Self-Assessment and Benchmarking Programs*, Rev. 5, 6/29/2018.

59.     Importantly, at the time the decision was made to remove the Plaintiffs in late 2018, no "benchmarking" of other nuclear site ECP programs had been done by anyone.  Therefore, no new skill set for ECP employees had been identified.

60.     Boerschig and Joe Calle, Director of TVA's Organizational Effectiveness Program, travelled to the Susquehanna nuclear plant in Pennsylvania on January 30, 2019, at least a month after Boerschig made the removal decision.  There they met with the Susquehanna ECP manager Larry James.  (James was subsequently hired to replace Inza Hagins-Dyer at TVA, almost immediately after her removal in Summer 2019.)

61.     Eventually, the fact that the *ex post facto* January 30, 2019 trip to Susquehanna was claimed as "benchmarking," even thought it was not, was confirmed and entered into the TVA Corrective Action Program (CAP) on July 2, 2019.  (CR #1526768).

62.     Notwithstanding the subsequent assurance to TVA's OIG and the NRC Region II Administrator, Laura Dudes, and the public, that benchmarking had been done as <u>a basis</u> for the removal decision, that was not an accurate statement.

17

<u>"Skills and Ability" Issue</u>

63.     Between the January 23, 2019 NOC meeting and the May 13, 2019 removal of the ECP staff, there was an elaborate process engaged in to massage the job descriptions to provide an allegedly legitimate basis to claim that the Plaintiffs were no longer qualified to do their own jobs, as well as to modify relevant Human Resource procedures, and take other actions to support the myth that the removal decision was based on alleged legitimate, non-retaliatory reasons.

64.     Skills and abilities are supposed to be part of a TVA-approved position description.  At the time the Plaintiffs were told they were being removed, no new job description had been prepared.  Six weeks later, when they actually vacated their positions, and were replaced by interim ECP managers, there was still no new job description.  The TVA HR procedures and processes for removing the Plaintiffs from their positions, or in filling new positions at TVA, were not followed in removing the ECP personnel, selecting the interim ECP contractors, identifying the new ECP positions.  In addition, the new position was not posted for a competitive selection process, which is out of the HR processes, and did not meet the use of a "rotational" position, or short-term duration provided for her TVA HR procedures.

65.     The new ECP job description, containing only one difference in experience, i.e., supervisor experience, was not actually developed until after the new personnel were hand-picked by management.  The Plaintiffs were still qualified for the new position description.

<u>The Executive Review Board (ERB) Was Not Legitimate</u>

66.     TVA was required, under the terms of the Confirmatory Order, to "implement a process to review proposed licensee adverse employment actions at TVA's nuclear plant sites

18

before actions are taken to determine whether the proposed action comports with employee protection regulations, and whether the proposed actions could negatively impact the Safety Conscious Work Environment (SCWE)." (12/22/2009 Confirmatory Order, EA-09-009; 09-203).

67.     TVA established an Executive Review Board (ERB) and procedures to provide guidance for managers to perform the ERB process, the purpose of which was to 1) ensure that discipline is not taken because an employee engaged in activities protected by the employee protection regulations of Title 10, CFR; 2) determine if the proposed adverse action is consistent with recent disciplinary actions taken in similar circumstances in accordance with disciplinary policy; 3) evaluate whether proposed or taken Adverse Employment Actions, despite their legitimacy, could negatively impact the SCWE; 4) develop a SCWE Mitigation Plan to mitigate a potential negative SCWE impact if the employment action, despite its legitimacy, could be perceived as retaliatory by the workforce.  NPG-SPP-01.7.4, Rev. 2 (8/13/2018). The process is supposed to be independent, free from conflict of interest, and implemented with executive scrutiny.  *Id.*

68.     The ERB to approve the removal of the Plaintiffs was held on April 26, 2019. Boerschig presented his decision to remove the Plaintiffs from their ECP positions.  He stated that the decision was based on the benchmarking and the Plaintiffs' lack of skills and abilities to fill the new positions.  As noted above, the actual decision to remove the Plaintiffs was made before any benchmarking had been done and before any new position descriptions had been developed, so Boerschig's presentation was false.  He did not tell the ERB that the motivation to remove the Plaintiffs was based on the OIG Report.

19

69.    The ERB was not independent, instead being conducted by Amanda Poland, Nuclear HR Manager, who had been the subject of a recent (March 25, 2019) ECP Investigation substantiating general work environment concerns impacting trust NEC-18-1021, NEC-18-1089), and should have been conflicted out of membership on the ERB.  Poland also had orchestrated much of the behind-the-scenes work on the subterfuge to modify job descriptions that, in theory, the Plaintiffs did not qualify for.[3]  Poland did not provide this information in the ERB.

70.    Joe Calle also participated as a member of the ERB, in his role as a Nuclear Safety Culture Peer Team Member.  In that role he had responsibility for reviewing and approving the SCWE Mitigation Plan Screening.  He was listed by Boerschig as supporting him in the Change Management process involving the Plaintiffs, and had gone to the Susquehanna plant with Boerschig to meet with Larry James.  As such, he was in effect, approving the results of his own work in coordinating the removal of the Plaintiffs with Boerschig.  He also received a change in title and supervisory authority, as a result of the removal of Hagins-Dyer.

71.    Also, in attendance at the ERB was Ryan Dreke, Associate General Counsel, Steve Douglas, VP of Nuclear Engineering, and John McCann, a member of the Nuclear Safety Review Board and Safety Culture Consultant.  No probative questions were asked by the senior managers that should have identified the suspect decision.

---

[3] Poland was also instrumental in changing the qualification requirements for Inza Hagins-Dyer's Senior Program Manager position, significantly lowering the qualifications which had required a minimum of a Bachelor's degree (BS), and preferably a legal degree and/or an MBA, and 12 years of professional experience; to a preferred BS degree, and 8 years of experience. These changes allowed James, from Susquehanna, who had only completed an AA degree in May 2019, to qualify for the position.  James was hired by Boerschig at TVA shortly after the removal of the entire ECP personnel.

20

72. The ERB is also charged with ensuring that personnel decisions do not cause a chilling effect through an appropriate "mitigation plan." The mitigation plan was a complete and abject failure, since shortly after the announcement, there was a widespread and significant perception that the removal of the ECP staff was retaliatory. As documented in the subsequent surveys, the decision resulted in "a negative impact on Nuclear Safety Culture across the Fleet." (Calle memorandum to Rausch, Re: *Semi-Annual Report on Safety Culture and SCWE*, November 8, 2019). As stated by one employee in an email sent to Plaintiff Fults shortly after they were all removed, "… I am sorry, I should have just sucked it up and not spoke up about anything."

**Specific Legally-Protected Activities**

73. Each of the Plaintiffs, individually and collectively, engaged in activities protected by the ERA throughout their tenure as ECP managers. These activities included actions that they each individually, and/or collectively, engaged in when they received, and acted on, worker allegations of potential nuclear safety violations of the AEA, and potential violations of the ERA and/or 10 C.F.R. § 50.7 regarding retaliation against employees and contractors for raising concerns. Those actions included the intake of the concerns, evaluating and investigating the concerns, responding, and reporting the concerns and results to TVA management. According to the ECP procedures, the ECP then monitored whether appropriate TVA management took corrective actions to address the concerns.

74. The Plaintiffs' responses to nuclear safety concerns of employees, as well as investigations into employee complaints of violations of 10 C.F.R. § 50.7, other NRC requirements and expectations, and violations of other rules, regulations and procedures, are too

21

voluminous to list separately. Most issues have been disclosed and enumerated in the underlying Department of Labor (DOL) case discovery responses submitted October 27, 2021, and are fully incorporated as if set out fully herein. Additionally, the ECP cases are enumerated in the TVA ECP case files and documents no longer available to the Plaintiffs.

75. These protected activities met with varying degrees of animosity, resistance or opposition by TVA management; and the ECP received little support from Boerschig, the VP of Nuclear Oversight. Instead, as TVA's regulatory SCWE performance declined from 2016 through 2018, TVA site and Corporate management's opposition to the ECP's "pulsing" and monitoring activities increased. Instead of solving the SCWE issues, the focus became stopping the identification of them by the ECP, and "attacking the messenger."

76. One of the activities that all of the Plaintiffs engaged in was conducting the regular work environment "pulsings" that were required by the 2009 Confirmatory Order; they also conducted other work environment assessments at the various nuclear plants in response to incidents or events.

77. Some TVA site managers objected to the actions of the ECP in conducting assessments, displaying animosity towards the Plaintiffs, and complaining to Boerschig. One example of this occurred when Plaintiff Fults was conducting a required pulsing of the WBN Security Department. WBN Unit 2 Site Vice President Mike Skaggs told her not to conduct any future pulsing surveys without first coordinating them through him; and if she was going to conduct pulsings, she could talk to employees, but could not give them any forms for them to put anything in writing. Skaggs later became the Chief Operating Officer of TVA, and was in that

22

role when the Plaintiffs were all removed from their positions. Skaggs has since retired from TVA.

78.     Another example of animosity towards the ECP and the Plaintiffs was an incident in 2015 in which Plaintiffs Babb and Fults attended a meeting in the SQN Mechanical Maintenance group (MMG) to discuss a possible chilled work environment. During the meeting the MMG supervisor drew a noose on the chalkboard behind the ECP personnel conducting the meeting. No action was taken against the supervisor who drew the noose.

79.     Plaintiff Babb engaged in internal protected activities which included, but was not limited to: in 2017-2018, when she conducted an assessment of work environment issues following staffing changes within the SQN Fire Operations department, and the impact of these changes on the site's required Emergency Response capability. In about 2016 she also conducted assessments and investigated concerns within the SQN Training Center, in response to safety concerns and findings of a chilled work environment. In about 2016, she conducted pulsings and investigations into the Facilities Department, after finding the employees were afraid to raise concerns. In 2017 Plaintiff Babb substantiated a chilling effect within the SQN RadPro department; and, in 2019, found a chilling effect within the RadPro and Chemistry departments.

80.     Plaintiff Fults, as the Corporate and "roving" ECP Senior Program Manager, engaged in internal protected activities which included, but was not limited to: in 2017 she received copies of photos of the condenser failure at WBN U2, in which part of the welds failed. Subsequently the photos were given to the media. She was falsely accused by Boerschig of leaking the photos to the media.

23

81.     Another example of animosity towards the Plaintiffs occurred in 2018, when Plaintiff Fults and Ruth Fordham, the WBN ECP Senior Program Manager, conducted an investigation of numerous issues within the WBN Projects department.  They found a chilling effect within the department caused by the Site Vice President and the Site Project Manager. Only after the Site VP resigned was the ECP report released to the new Site VP, who challenged the report and told the ECP Senior Department Manager, Ms. Hagins-Dyer, that "only the NRC" could find a "chilled work environment."

82.     Plaintiff Fults also investigated employee concerns of nuclear safety significance, retaliation, and chilled work environments within and about the WBN Security, Operations, RadPro and Chemistry departments from 2013 to 2015; the SQN MMG and MEG departments in 2015; the Facilities department (Day and Zimmerman issues) from 2015 to 2016; and at the TVA Corporate Level, Nuclear Projects and Watts Bar Projects Departments from 2018 to 2019; Security, Corporate Nuclear Licensing, Operations Support-Performance Improvement; Quality Assurance; and the Corporate Functional Area Managers (CFAM) organization from 2015 to 2019.

83.     In May and June 2016, Plaintiff Fults filed an allegation with the NRC regarding the TVA ECP's chilled work environment, and the dysfunctional CAP at WBN, along with providing information about an inadequate discrimination investigation performed at SQN by TVA's OGC.  She also participated in the NRC inspections related to that allegation.

84.     On November 22, 2016, Plaintiff Fults reported to the NRC's Allegations Office a pattern of harassment and retaliation directed toward her, during her performance review.  She

24

also reported an incident that resulted in the compromise of the Plaintiff's ECP investigative file involving Corporate Nuclear Licensing department employees.

85.     Between 2016 and 2019, the Corporate Nuclear Licensing department became embroiled in a high-profile controversy in which there were multiple complaints and cross-complaints among the professional staff.  Plaintiff Fults and ECP Senior Manager Inza Hagins-Dyer identified a number of instances in which the behaviors of the professional staff, including the Senior Manager of Regulatory Affairs, Erin Henderson, warranted the issuance of ECP Corrective Action Letters addressed first to Ms. Henderson's boss Joe Shea, VP of Nuclear Licensing, and a second letter to Mr. Shea's boss David Czufin, Senior VP Engineering and Operations Support.  Shea, Henderson, and upon information and belief, Cfuzin, all complained to Boerschig about ECP investigations done by the Plaintiffs in their departments.  The controversy led to NRC investigations, enforcement actions, and a hearing before the NRC.

86.     Plaintiff Fults participated in the NRC activities connected with these NRC proceedings.

87.     As the BFN ECP Senior Program Manager, Plaintiff Richerson also received, investigated and reached determinations on nuclear safety concerns or complaints of retaliation at BFN including, but not limited to:

- Work Environment Issues in Operations (NEC–19-00362) (April 2018);

- QA Member of NOS alleging HIRD and CWE in NOS (NEC-18-01061) (December 2018);

- Retaliation and Discrimination towards an employee through the performance review process, substantiated (NEC-18-01096) (December 2018);

- Conflict between Radwaste Employees (NEC-18-00908) (October 2018);

25

- OIG Identified Chilled Work Environment within NOS (NEC-18-00834) (October 2018);

- Adverse Action Process Not Applied (NEC-18-00770) (September 2018);

- Review of the SCWE at BFN ISFSI Project - Chilled Work Environment, substantiated (NEC-18-0067) (August 2018);

- Operations Department Co-worker conflict (NEC18-00363) (April 2018);

- Review of Work Management CRs and Conflict - poor management behavior, substantiated (NEC-18-0262) (March 2018);

- Radiation Protection Work Practices (NEC-17-00845) (September 2017);

- Operations, Radiation Protection and Security CR SCWE Review (NEC-17-00804) (September 2017);

- Review of Security SCWE – poor management behaviors, substantiated (NEC-17-00502) (June 2017);

- Investigation of Chemistry Work Environment Management Issues – management and employee conflict, substantiated (NEC-17-00385) (May 2017);

- Investigation of Work Management Department Work Issues – poor management behaviors, substantiated (NEC-17-00255).

88.     As part of his duties, Plaintiff Richerson conducted investigations, including those resulting in the identification of chilled work environments or retaliation, which resulted in the issuance of an ECP Corrective Action Letter to the appropriate Vice President requiring a formal response and documentation of actions taken to resolve the chilled work environment. This situation occurred, at a minimum, in the Maintenance Department, Fix-It-Now (FIN) Organization in 2015 and 2016, and the Western Area Radiological Lab (WARL) in 2017.

89.     Plaintiff Babb also received and addressed nuclear safety concerns, usually having a CR opened by management so as to additionally shield the fact that someone had brought an issue to the ECP.  She also investigated such concerns, identified in CRs regarding an

26

electrical ground truck concern in 2019, and concerns about the SQN reactor head seal in 2016. Other issues and concerns that she was assigned and investigated are contained within ECP and TVA files to which she no longer has access.

90.     When Plaintiffs began their career in ECP, pulsings, interviews, and employee interactions were completed on a routine basis and, as necessary, to perform job responsibilities. However, as the work environment deteriorated, as identified by the NRC WBN Chilled Work Environment letters for Operations and RadPro, site management began limiting ECP interactions such that no formal pulsing schedule was "approved" for 2018 and 2019.

91.     In February 2019 Plaintiff Richerson filed an allegation of retaliation with the NRC regarding his performance review for Fiscal Year 2018; and participated in the NRC investigation of the various issues raised in that complaint, including compliance with terms of the Confirmatory Order.

92.     The NRC requires each nuclear plant to have a corrective action system, and identifies, tracks and trends conditions adverse to quality.  10 C.F.R. Part 50, Section XVI.[4]  The Plaintiffs initiated TVA Condition Reports (CRs) regarding identified nuclear safety deficiencies that were not being addressed by the TVA management process throughout their tenure; including approximately 75 CRs initiated by Plaintiff Richerson while working in the ECP.  The

---

[4] "Measures shall be established to assure that conditions adverse to quality, such as failures, malfunctions, deficiencies, deviations, defective material and equipment, and nonconformances are promptly identified and corrected.  In the case of significant conditions adverse to quality, the measures shall assure that the cause of the condition is determined and corrective action taken to preclude repetition.  The identification of the significant conditions adverse to quality, the cause of the condition, and the corrective action taken shall be documented and reported to the appropriate level of management." 10 C.F.R. 50, Appendix B, Criterion XVI.

CRs include, but are not limited to: CR 551014 (Rigging Associated with Turbine Shell); CR 1220558 (Evaluation of Test Frequency of HPCI Valves); CR 968032 (Items for Consideration to Improve Vessel Decon); CR 568686 (Possible Trend in PERs with SCWE Codes); CR 940280 (Trend in NRC Onsite Allegations); CR 1205932 (TVA Plants are Leading the Industry in on-site NRC Allegations); CR 1325358 (ECP Corrective Action Letter 4/4/17); CR 1312337 (ECP Corrective Action Letter 6/19/17); CR 650989 (Clarification to NPG-11.10 - Adverse Employment Action); CR 675067 (Improvement to Adverse Action Process); CR 17556 (Adverse Employment Action Awareness); CR 731091 (Adverse Employment Action Process); and CR 731152 (Failure to Use the Adverse Employment Action Procedure Identified).

93.     Each of the Plaintiffs, individually, also communicated their concerns about management animosity towards and interference with their ECP duties in numerous internal assessments, and ultimately, to the TVA OIG. This was published in the 2016 and 2018 TVA OIG Evaluations of the Nuclear Oversight, and ECP, work environment.[5] The publications of the TVA OIG Reports undeniably exposed the Plaintiffs to TVA management in a high profile and embarrassing way. Their participation was known to TVA management when the Reports were publicly issued.

94.     After the TVA OIG published its 2018 findings, and still not seeing any actions being planned to address the concerns, Plaintiff Richerson initiated Condition Report 1453005 on October 3, 2018. The CR was closed by management on November 15, 2018 with no action

---

[5] Plaintiff Babb was interviewed by the OIG throughout her tenure, at least seven times between 2016 and July 2019.

taken. He also opened an ECP file regarding the TVA OIG 2018 findings (NEC-18-00834), which was closed after he was removed from his ECP position, based on the removal.

95.     In spite of the TVA OIG finding, Boerschig denied the existence of a "chilling effect" within the ECP department, and was annoyed at the finding. Hagins-Dyer asked Plaintiff Fults to analyze the department work environment, using the NRC criteria. Using the regulatory criteria, Plaintiff Fults confirmed that a chilling effect existed in the ECP department, and issued a memo with that conclusion on November 15, 2018.

96.     Each of the Plaintiffs, individually and collectively, provided information to and cooperated with the NRC proceedings through NRC inspections, investigations, and other regulatory actions from 2016 through 2019. TVA management was aware of the Plaintiffs' participation in the NRC inspections, either directly or indirectly.

97.     Each of the Plaintiffs, individually and collectively, filed complaints with the NRC and the DOL, regarding retaliation. Plaintiff Richerson filed a complaint with the NRC on February 13, 2019 regarding the chilled work environment in the Nuclear Oversight department and what he believed was retaliation in connection with his performance evaluation. NRC Allegation No. RII-2019-A-0022.

98.     In May 2019, after the Plaintiffs were removed from their ECP positions, and again on June 4, 2019, they filed a complaint of retaliation with the NRC, which also raised serious concerns about the proposed changes to the ECP, the lack of an immediate alternative avenue for employees, and removing programmatic independence.

99.     The June 4, 2019 NRC complaint was covered in the local news media. Almost all of the notices and public statements regarding the Plaintiffs' removal from their positions,

29

were made after TVA knew of the Plaintiffs' complaints to the NRC that their removal was retaliation.

100.    In November 2019 the Plaintiffs, individually and collectively, engaged in legally protected activity when they filed a complaint with the DOL raising the claims regarding retaliatory removal and transfer, damage to their professional reputations, and damages regarding personal anxiety, emotional distress and other harm as enumerated therein.

101.    Since that time the Plaintiffs have cooperated with various NRC and DOL investigations, inspections, interviews, meetings and other activities, including Congressional investigations.

**Adverse Actions**

<u>Removal from ECP Manager Positions</u>

102.    On May 13, 2019 Boerschig notified the Plaintiffs that they were all being removed from their positions within the ECP program.  He told them it was not based on their performance.  Their removal was to be effective July 8, 2019.

103.    On July 8, 2019 Plaintiff Babb was required to relocate from the SQN ECP office to an interim assignment within the Quality Assurance organization at SQN.

104.    On July 8, 2019 Plaintiff Richerson was required to relocate from the BFN ECP ECP office to an interim assignment within the Quality Assurance organization at BFN.

105.    On or about July 18, 2019, when Plaintiff Fults returned from maternity leave, she was required to relocate from the Corporate ECP office to an interim assignment within the TVA Project Management organization.

<u>Public Embarrassment, Shame and Humiliation</u>

106.     The day after the Plaintiffs were told they were being removed from their ECP

Senior Program Manager positions, but while remaining in those positions, TVA began a series

of site-wide announcements regarding their removal.

107.     On May 14, 2019 the TVA Nuclear internal publication, *Keeping Current,*

published an announcement to the TVA nuclear workforce entitled "*Changes to Employee*

*Concerns Program Structure*", stating the reason for the change as being "[i]n response to

employee feedback that the ECP program is not an effective alternative avenue for raising

concerns."  It also falsely stated that the "changes were based on benchmarking with other

utilities that have a high performing ECP…."

108.     On May 30, 2019 TVA Nuclear *Keeping Current* published an "*Employee*

*Concerns Program Update*" to the entire nuclear workforce providing "clarifications" to the

original announcement.  The *Update* again misstates "Employees have told us – through surveys,

focus groups and discussions – that change is necessary in order to build the desired confidence

that ECP is a viable avenue for raising nuclear concerns."  It also, again, falsely claimed that the

changes were a result of benchmarking with other utilities and that the decision to remove the

Plaintiffs was because they were "required to have different backgrounds and skillsets."

109.     On June 6, 2019 TVA issued yet another internal publication, this time in its *Fleet*

*Focus* publication*,* again claiming that the feedback from "our regulator" and the employees was

that the "program has experienced inconsistent performance in efficiently and effectively

resolving potential issues."  It again restates that the Plaintiffs could not continue in their job

because they did not have the requisite "skills, abilities, and experience."  Additionally, it

31

inferred falsely, that the regulator agreed with its actions, stating: "All the actions we've taken so far are following our plan – which we've discussed in detail with the Nuclear Regulatory Commission …."

110.    On June 11, 2019 TVA issued another *Fleet Focus*, again inferring that the basis for removing the Plaintiffs was their performance failures, and to increase "employee trust" in the ECP, and "restore employee confidence" in the ECP.

111.    On June 27, 2019 TVA issued another *Keeping Current*, again discussing the program in a way that denigrated the work of the Plaintiffs, who were still in place in their ECP positions.  The publication included the following statement:

> "Over the coming weeks we will be selecting ECP representatives that have the desire and ability to make the workplace healthy and safe, and who have the skills and experience to work with line management and support organizations to get issues resolved…."

112.    This statement, among others, inferred, insinuated and implied to any reasonable consumer of this publication that the Plaintiffs did not have the "desire and ability to make the workplace healthy and safe," and did not have "the skills and experience" to work with line management and the support organization to get issues resolved.

113.    None of the public statements, released internally or externally, included a statement, originally written by Boerschig and included in the drafts of each of his prepared communications, acknowledging that the Plaintiffs were *"dedicated nuclear professionals who have made it their mission to address employee concerns to improve the work environment.  I thank them for their dedication to their profession and to the TVA employees.*"

114.    Other statements, issued after the July 8, 2019 removal from their positions repeated similar denigrating statements or inaccurate claims. The positive acknowledgment of

32

the professionalism and competence of the Plaintiffs by Boerschig was removed from all notices. The notices also omit the influence of impacted managers on the decision to remove the Plaintiffs, misstate the actual information from relevant surveys, focus groups and discussions, and inaccurately claim that the decision to remove the Plaintiffs was made based on benchmarking.

115.    Similar representations were made in the local news media, including the *Knoxville News Sentinel* (6/5/2019); the *Knoxville Times Free Press* (6/6/2019); *WDEF News Channel 12* (6/7/2019); *Associated Press* (Knoxville 6/7/2019); *The Energy Daily* (6/10/2019); *S&P Global Platts* (6/19/2019); *The News Courier* (8/3/2019 and 11/12/2019); and a June 5, 2019 article by blogger Cari Wade Gervin, entitled "*TVA Fired an Entire Nuclear Oversight Department.*"   TVA also included similar comments in public statements, stating it relied on "employee and regulator feedback and industry input…." *Knoxville News Sentinel* (11/13/2019).

116.    The statements to the workforce and the public did not include the fact that the "negative feedback" referred to complaints about ECP members <u>by</u> TVA management themselves; in fact, by some of the very managers who had been the subject of ECP investigations, and/or findings of inappropriate behaviors, and/or misconduct.

117.    The combination of these intentional misrepresentations, the false claim that the decision was based on benchmarking, the inference that the regulator had approved their individual removal, and the statement that the Plaintiffs were not qualified to perform their own job, the insinuation that they did not care about nuclear safety or the employees, so were being replaced by others who did, as well as the deletion of Boerschig's positive recognition, were each intentional words chosen by TVA.

33

118.     The announcement of the Plaintiffs' removal from the ECP was done pursuant to a widespread, comprehensive, intentional, public communication plan.  TVA's Chief Nuclear Officer Tim Rausch provided the information to his direct reports, who then rolled out the information to their direct reports, and so on.  In addition, a "town hall" type meeting of the workforce was held at each site which also presented the same inaccurate and misleading information.

119.     TVA knew, or should have known, that the combination of these misrepresentations and failure to include any positive recognition of the Plaintiffs presented a picture to the entire workforce, the community, and the public at large, including potential employers, that the Plaintiffs had been removed from their positions for negative performance and/or lack of trustworthiness and confidence in them personally by the TVA workforce and the regulators.

120.     As stated above, these statements were either not true, were misrepresented, and/or removed information that would have mitigated the harm to the Plaintiffs' reputations, as well as that could have mitigated the personal embarrassment, humiliation and shame brought on by the intentional conduct of the Defendant.

Professional Defamation and Injury to Professional Reputation

121.     Plaintiffs reincorporate paragraphs 102 to 120 as if fully set forth herein.

122.     As a result of the removal from their positions, the high-profile manner in which they were removed, along with the negative comments and inferences made by Defendant, Plaintiffs not only lost their position as ECP managers, they also lost their good reputations as ECP professionals.

34

123.     The role of ECP professional in the commercial nuclear industry is relatively small, with only 88 licensed commercial nuclear reactors nationwide as of May 22, 2022; and several international nuclear ECP programs within the United Arab Emirates (UAE) and China, and facilities within the Department of Energy complex.

124.     Most ECP managers, investigators, and representatives belong to a national professional organization, the National Association of Employee Concerns Professionals (NAECP), and are all well known to each other.  The removal of the Plaintiffs was a significant event within the small ECP industry, i.e., all of the personnel within an ECP program being removed at one time.

125.     The public dissemination of the information TVA used to describe the reasons that the Plaintiffs were removed from their positions could reasonably be expected to influence other potential employers and professional colleagues of the small ECP industry.  That information included the inference that they had been unsuccessful as ECP professionals, were not trusted by the workforce, did not have the confidence of the workforce or the regulator, and had to be removed from their positions to protect the ECP program and nuclear safety itself.  These attributes go to the core of their value as professionals.  These publications could also affect their employment in other professions where they have previous experience, since it reflects poorly on their dedication, competence, and professionalism.

126.     Plaintiff Fults applied, unsuccessfully, for available ECP positions for which she was well qualified.  She was unable to find any job within TVA nuclear, or at other ECP programs.

127.    Plaintiffs Babb and Richerson, because of family limitations, were unable to seek employment as ECP professionals outside of the area, but were unable to find any meaningful assignments within TVA, despite submitting numerous applications seeking other positions. Instead, both were only able to find continued employment in the same departments that they had occupied years earlier.  Plaintiff Babb applied at Susquehanna for the ECP position Larry James vacated, but was not given an interview.

## V. LEGAL CLAIMS

128.    At all relevant times, Plaintiffs Babb, Fults and Richerson were "employees" as defined in the ERA.

129.    At all relevant times, Defendant TVA was an "employer" as defined in the ERA.

130.    The Plaintiffs, individually and collectively, engaged in legally protected activities as described above and incorporated herein, throughout their employment at TVA. These activities included, but are not limited to:

A.    As ECP mangers, charged with monitoring the site's safety conscious work environment pursuant to the conditions imposed in the various NRC Confirmatory Orders and Enforcement Actions, they each, individually and collectively, conducted "pulsings" of nuclear plant work environments, investigated employee allegations of supervisor retaliation; investigated employee concerns regarding potential nuclear safety concerns, and investigated other potential violations of various terms and conditions of the license requirements, and other matters within the scope of their duties.  42 U.S.C.§ 5851(a)(1)(A).

36

B. Assisted and participated in proceedings, i.e., NRC inspections/ investigations conducted pursuant to the AEA and/or the ERA when they individually, and/or collectively, provided information, testimony, filed complaints, and made statements in connection with:

- Providing information to and cooperating with investigations conducted by the TVA Office of Inspector General, including the 2016 and 2018 OIG investigation into the work environment within the ECP;

- Filing complaints with, providing information to and cooperating with inspections, investigations, and hearings conducted by the NRC;

- Providing information to and cooperating with investigations and hearings of other employees engaged in protected activity before the U.S. Department of Labor;

- Providing information to Congressional investigators;

- Filing complaints of retaliation with the federal government, DOL OSHA in November, 2019 regarding their removal from their positions.

42 U.S.C. § 5851(a)(1)(F).

131. Defendant's decision-makers responsible for the adverse actions against the Plaintiffs all had direct and indirect knowledge of the Plaintiffs' various individual and collective legally protected activities.

132. The Plaintiffs were involuntarily removed from their positions and forced to work in different, and significantly lower value positions, which impacted the terms and conditions of their employment; denied them the benefits of their professional positions; and, which could have impacted, and did impact, other employees' willingness to raise concerns.

133. The Plaintiffs each suffered harm to their professional reputation as ECP professionals as a result of the intentional actions of the Defendant, who repeatedly published

37

inaccurate, misleading, and/or false statements about the Plaintiffs, which a reasonable person would understand to place the Plaintiffs in a false light, and infer to any reasonable person that they were removed from their positions for cause. Defendant's actions could have impacted, and did impact, other employees' willingness to raise concerns.

134. The Plaintiffs each suffered immense shame, embarrassment, anguish, loss of self-esteem, anxiety and emotional distress as a result of the manner in which the Plaintiffs were removed, the public announcements that they were, in effect, failures in their jobs. Being left in the job for almost two months after the initial removal announcement, caused them immense shame, embarrassment and anguish on a daily basis. For years employees had trusted them. The implementation of their removal was intentional, and could reasonably be expected to cause personal harm to the Plaintiffs. It also could, and did, impact others' willingness to raise concerns.

135. The Plaintiffs' engagement in legally-protected activities was a contributing factor in the decision and action to remove them from their positions in ECP, and the manner in which their removal was carried out, which damaged the Plaintiffs' professional reputations and caused them mental anguish, emotional distress, person anxiety, embarrassment, depression, and undue stress.

136. TVA cannot present clear and convincing evidence that it would have made the decision to remove the Plaintiffs in the absence of their individual, and collective, protected activities. Instead, the objective evidence is that the decision to remove Plaintiffs was made in about December 2018, based on their protected activities.

38

137.    As a result of TVA's unlawful removal of the Plaintiffs from their ECP positions, they have each, individually and collectively, been denied the ability to continue to work in a job which they loved, and to serve the employees of TVA as an independent, empathetic avenue to raise nuclear safety or other concerns.  Their removal also denied them the ability to continue their career path within the Employee Concerns Program and be a valued member of nuclear management.  Instead, they were forced to find jobs of lesser significance and value, in some cases filling positions with no real duties, or to leave the nuclear organization entirely.

138.    The way in which the Plaintiffs were publicly removed, subjected them to shame, humiliation, embarrassment, and harm to their professional reputations as ECP professionals.

139.    As a result of these adverse actions, the Plaintiffs were subjected to mental anguish, emotional distress, personal anxiety, embarrassment, depression and undue stress.

140.    The compensatory damages incurred by the Plaintiffs each exceed $75,000.00, as enumerated in information provided to Defendant and incorporated herein.

141.    The Plaintiffs have also incurred and continue to incur attorney fees and costs.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray as follows:

a.    That the Court issue and serve process on Defendant and require Defendant to answer within the time prescribed by law;

b.    That the Court issue equitable relief requiring Defendant to reinstate Plaintiffs into the positions from which they were unlawfully removed; accompanied by a public acknowledgement by Defendant that the removal of the individuals was

39

not based on any legitimate reason; and a public apology to the Plaintiffs, printed in the TVA publications, as well as in a press release to the media, i.e., given the same distribution as the media who received the TVA comments denigrating the Plaintiffs. This statement should also be sent to the NAECP organization of their peers.

c. In addition to reinstatement, Plaintiffs seek equitable relief of the restoration of all of the privileges and responsibilities that they enjoyed in their ECP positions, an outstanding performance review for 2019, and all of the bonuses or benefits associated with the position, as if they had remained employed in that position.

d. Plaintiffs also seek from the jury an award of all compensatory damages, in an amount to be determined, for all the physical, mental and emotional anxiety, depression, shame and embarrassment that TVA caused them in connection with their removal from their positions, the public and personal shame and embarrassment, and the loss of enjoyment of personal and family relationships.

e. Plaintiffs seek all monetary and compensatory losses they have incurred to date as a result of lost time, increased medical bills, financial actions taken to preserve resources in the event of imminent termination, lost bonuses or promotions, to which they would normally have been entitled.

f. That Plaintiffs be awarded attorney fees and costs, and such other and further relief as is deemed proper under the facts and law of this case; and

g.    That a jury try all claims and issues triable by a jury.

Dated:  May __, 2022                    MIKEL & HAMILL PLLC


                                        By:    _____
                                               Doug S. Hamill, BPR No. 022825
                                               Attorney for Plaintiffs
                                               620 Lindsay Street, Suite 200
                                               Chattanooga, TN  37403
                                               (423) 541-5400
                                               dhamill@mhemploymentlaw.com


                                        CLIFFORD & GARDE, LLP

                                        By:    _____
                                               Billie Pirner Garde
                                               Attorney for Plaintiffs
                                               *Pro Hac Vice* (to be submitted)
                                               815 Black Lives Matter Plaza, NW
                                               Suite 4082
                                               Washington, D.C. 20006
                                               (202) 280-6116
                                               bpgarde@cliffordgarde.com

41